Moncure, P.
delivered the opinion of the court.
The main, though not the only, questions arising in this case are, first, whether the decree pronounced by this court on the 28th day of August 1858, declaring 4t that the assignment purporting to have been made by the testator, James B. Campbell, on the 1st day of October 1852, to his brother, Thomas Campbell, and relied upon in the answers as constituting a valid gift of the notes and bonds of the said testator, did not operate as a valid gift thereof in the lifetime of the testator, so as to bar the widow from recovering her distributive share thereof, she having renounced the provisions made for her by the will of her husband,” is or is not a final and conclusive decision of the question as to such validity in this case ? And if not, then, secondly, whether, upon the whole case as it now stands, that decree was right or wrong ?
The second of these two questions was very fully argued by the counsel in the cause ; and the counsel for the appellees earnestly and ably contended that, treating the question as res integra, and looking at all the testimony in the cause, including that of Benjamin B. Campbell, supposing him to be a competent witness, this court would have to make the decision now which it made when the case was formerly before it; while, on the other hand, the counsel for the appellants, just as earnestly and ably, contended for the contrary. If we had to decide the question thus at issue between the counsel, we might have some difficulty in doing so. But we are relieved of this difficulty by the views we entertain of the question first above stated. And we will now proceed to present those views :
Then, recurring to the first question, we enquire *666 whether the said decree of this court of the 28th day of August 1858, is or is uot, a final and conclusive decision as aforesaid ? Or, in other words, whether this court can now reverse or alter that decision ?
In White v. Atkinson, 2 Call. 376, decided in 1800, it was held that the court of chancery cannot make any alteration in the terms of a decree of this court certified thither, in order that a final decree may be made in the cause.
In Price v. Campbell, 5 Call. 115, decided in 1804, the same doctrine was held. Tucker, judge, said: “ The single question is whether the chancellor could, upon the same facts, change the decree of this court ? The case of White v. Atkinson, 2 Call. 376 (supra), decides that he could not; and I approve of that decision. It makes no difference that it does not appear, that the mistake was noticed at the time of affirming the former decree ; for the point was fairly presented upon the record, and it cannot be admitted that the court did not advert to it. A contrary doctrine would overthrow the whole theory of the law ; which supposes everything contained in the record to have been decided on ; and has wisely established the rule that interest reipublicae res judicalas non rescindí.” Carrington, Judge, was of the same opinion; and said the decision in White v. Atkinson “ ought to be adhered to, or there will be no end to controversies ; and parties will never be certain as to the result of the suit.”
In Campbell v. Price, &c., 3 Munf. 227, decided in 1812, it was held that the court of Chancery cannot correct by bill of review any error apparent on the face of the proceedings in a decree which has been affirmed by the Court of Appeals. It had before been held (in Price v. Campbell, 5 Call. 115, cited supra), that such an error could not be corrected on motion. The error here was most palpable, the sum decreed being currency, when it should have been sterling money.
*667 In the Bank of Virginia v. Craig, 6 Leigh 399, it was held that this court cannot' examine the propriety of a decree made at a former term inter partes, nor set aside such a decree of a former term, on the ground that it decided matters coram non judice at the time. This was a case of very great hardship, a decree having been rendered by this court against a surety who was no party to the appeal, and as to whom no decree had been rendered by the court below. The distinguished counsel for the surety moved the court at a succeeding term to set aside the decree; and he took this distinction : that though a decree made in a cause and between parties before the court, and which the court had jurisdiction to make, could not be set aside at a subsequent term, yet a decree made in respect to matters or parties coram non judice, a decree, in other words, which the court had no jurisdiction to make, might be set aside at a subsequent term. But this court overruled the motion on the ground that it could not then set aside the decree entered at the former term, whether it was prematurely entered or whether it was objectionable on its merits or not.
■ In Towner v. Lane's adm'or, 9 Leigh 262, decided in 1838, upon a petition for a rehearing of a cause in this court, at a term subsequent to that at which the court has entered a decree, but before that decree has been certified to the court beloio, on the ground that the depree was founded on a mistake in point of fact; the questiou was whether it was in the power of the court to allow the rehearing? And upon this question four judges present were equally divided in opinion. The rehearing was therefore refused. Judges Oabell and Brooke were for granting a rehearing in the case, because the decree of this court had not been certified to the court below, and they considered the case as still in the power and under the control of this court. Judges Parker and Brockenbrough were opposed to a rehearing, notwithstanding the decree had not been certified to the court below. *668 Some of the judges reviewed the authorities, both in England and in this state, on the subject, and the remarks of some of them are very striking and appropriate to the case we now have in hand for decision. Judge Parker said : “ It is just and expedient that there should be some termination to litigation. Particular cases of hardship must yield to general rules of convenience. "We must fix some period at which cases shall be considered as finally ended, or this court will be overwhelmed with applications for rehearing, and parties will be kept in continual uncertainty of their rights. Fix on any we may, individual injustice may be done; but upon the whole, the public good will be promoted by avoiding the mischiefs of uncertainty and long protracted law suits. This is one of the chief reasons why we adhere to erroneous precedents. Whatever the period may be, it ought to be certain, well defined and inflexible, or the evil is not remedied. ” After assigning reasons for fixing the end of the term as the period, he said : “ For these reasons I should incline, on principle, to say that the end of the term should be the end of the litigation, so far as this court is concerned ; and I think this rule is established by authority and he then proceeded to review the authorities.
Judge Brockenbrcugh, whose opinion immediately follows that of Judge Parker, said: “I concur in the opinion just expressed. I have always understood that when the term of the court ends, the case is no longer within the breast of the court, but constitutes part of the unchangeable records of the court. If it is after-wards deemed to be within the discretion of the court to reopen the record, what limit is to be placed to that discretion ?” After showing that the same reason which would justify the court in granting a rehearing at any time before the decree is certified to the court below, would also justify it in so doing, even after proceedings had in that court, to enforce that decree, he proceeded *669 to say: “ At that moment a discovery is made that the judgment or decree of this court is palpably erroneous ; ought not this court, in the exercise of the discretion which is claimed for it, to reopen and review the cause, and correct its own mistakes ? Certainly it ought to do so, on the principles contended for. But we have a recent and express authority that this cannot be done. In the case of the Bank of Virginia v. Craig, a decree was entered against the sureties in a guardian’s bond, who, although they were parties in the court of Chancery, were neither appellants nor appellees in this court. An execution was issued, and Mr. Hooe, one of the sureties, had given a forthcoming bond. He applied to this court for a rehearing at a subsequent term ; and surely if the court had had the discretion which is now contended for it would have been granted to him, for a case of greater hardship can hardly be imagined. Yet the court refused to rehear it, on the ground that it could not now set aside the decree entered at the former term, whether it was prematurely entered or whether it was objectionable on its merits or not.”
These seem to be all the material decisions of this court on the subject we are considering, to which we have been referred by counsel, or which we have met with, and they seem conclusively to show that after the end of the term of this court at which a judgment or decree may be rendered by it—or at all events, after such judgment or decree has been certified to the court below, it is too late to have the ease reheard in this court, upon any ground of error of law or of fact apparent upon the face of such judgment or decree, or of the record on which it was rendered. "Whether the rule be founded on principle, or be merely a rule of practice, it is alike absolute and inflexible. Public policy, if not necessity, requires that it should be strictly enforced, even in cases of the greatest individual hardship. The law has been settled by these cases, and has- *670 ever since been acquiesced in, and hence no more recent cases on the subject are to be found in our reports. Applications for rehearings after the end of the term have often since been made to this court, but have always been refused, and there the cases have ended. There is a recent statute authorizing the court, under certain circumstances, to rehear and review a case decided at the preceding term. Acts of Assembly 1869-70, p. 228, chap. 171, § 10. But that statute has no bearing on this case.
According to the 'authorities before referred to, we think it very clear that we have now no right to review and reverse the decree pronounced by our predecessors in this cause on the 28th <5f August 1858, more than fourteen years ago, and that we would have no such right, even if it were plain that that decree is erroneous. We have seen that this court has refused to review and reverse, or even amend, its own decree, made at the nest preceding term, although the error in such decree was palpable and occasioned great injustice, and although it obviously pi’oceeded from a mere oversight of the court. Here the cause was first decided in the court below on the 3d of October 1856, more than two years after the institution of the suit, when the parties had had the fullest opportunity of preparing for the trial, of which opportunity they fully availed themselves. After the appeal from that decision had been pending for a year, this court, on the 28th of August 1858, upon full and able argument, pronounced a decree reversing that of the court below, and settling forever, as was supposed, the principles involved in the cause, and leaving only an ordinary administration account to be settled, and the widow’s distributive share of the personal estate of her husband to be assigned to her or her representatives. And now, after the lapse of fourteen years since that decree, this court is asked to review and reverse it, upon evidence which, to say the most of it, and including as *671 part of it the incompetent testimony of B. B. Campbell, an interested party and the chief actor in the transaction from which the controversy arose, presents only a case ■of doubt as to^the correctness of that decree! A bare statement of the case would seem to be an all-sufficient answer to the application.
But it is contended by the learned counsel of the appellants, that while the decree of this court, of the 28th ■of August 1858, would have been conclusive, even upon the court itself, if it had been a final decree, yet that it was interlocutory only, and though conclusive upon the court below as long as it stands, it may be, and ought to be, reversed by the Court of Appeals itself for error ■on the face of the decree and record as they then stood.
"We know of no warrant for any such distinction as is thus attempted to be drawn between what are called final and interlocutory decrees of this court; and we have been referred to no authority in support of this view. As was correctly said by the learned counsel of the appellees in their argument of this case, all the judgments and decrees of this court are final, and none of them are interlocutory; at least, when they (as they almost always do) dispose of the whole case involved in the appeal; even though the appeal be from an interlocutory decree, and even though the cause be remanded to the court below for further proceedings to be had therein. There may possibly be an interlocutory decree in the Court of Appeals, as where that court disposes only of a part of the case at one term, and reserves it for further and final action at another. We have something like an example of such a case in The Commonwealth v. Beaumarchais, 3 Call. 107, 151, referred to by Judge Parker in Towner v. Lane's adm'r, 9 Leigh, 262, 280. But such cases must be extremely rare. The decree of this court is certainly not interlocutory, and is none the less final because it is upon an appeal from an interlocutory de *672 cree of the court below.. The latter decree does not impart its interlocutory nature to the decree of this court, which affirms or reverses it in whole or in part, or adjudicates the principles of the cause. The case made for the Court of Appeals by an appeal from a decree of the court below, whether final or interlocutory, is, as to the Court of Appeals, a complete case in itself, :and the decree of that court therein is final and conclusive between the parties, as well upon that court Itself as upon the court below; and the Court of Appeals can do nothing more in the course of the same litigation until a new and different appeal is brought up to it from some decree of the court below, rendered in the cause upon subsequent proceedings in that court; and then the-Court of Appeals can only review and revise that decree without interfering with its own former decree. The two appeals are different and independent cases in this-court. The decision of this court is not only final in regard to the decree appealed from, but also in regard' to all the prior orders and decrees in the case between themppellants and appellees. An appeal from a decree brings up the whole proceedings in the case prior to the decree; and either party can have any error against him in those proceedings corrected without the necessity of a cross a ppeal in any case. If a party fail to complain of any stnch error, and a decree be made upon the appeal, without'' correcting or noticing the error, such party will be concluded by the decree from appealing afterwards. Burton v'. Brown, not yet reported. See also Walker's ex'or., v. Page, &c., 21 Gratt. 636.
The cot msel for the appellants did not contend that this court could, or would, upon mere motion or petition, review am I reverse its decision at a former term; but contended that the court could, and in a proper case should, do -.so upon an appeal from a subsequent decree of the court below in the same case. It seemed to be supposed by the learned counsel that an appeal from a *673 subsequent decree would bring up the whole case to this court, and thus empower it to make such decree in it as justice might require. Now that is not the true theory. Such an appeal bi’ings up only the proceedings in the • case subsequent to the decision of this court on the former appeal. And the function of this court in the case is prescribed by section 23 of chapter 182 of the Code, as amended by the act approved June 23d, 1870, which declares that “The appellate court shall affirm the judgment, decree or order, if there be no error therein, and reverse the same, in whole or in part, if erroneous, and enter such judgment, decree or order as the court whose error is sought to be corrected ought to have entered, affirming in those cases where the voices on both sides are equal; provided, &c.” This is the only authority conferred upon the court in regard to the appeal, and it contains no power to interfere with a decree of the court upon a former appeal. Such a decree is coram non judice.
~We are, therefore, of opinion, that the former decree of this court in this cause ought not to be reversed, and cannot be reversed, for error on the face of the decree and record as it then stood, even supposing that such error actually exists.
But however that may be, it was further contended by the counsel for the appellants “ that for new matter, not available at the first hearing below, and not in the record on the former appeal, the court below ought to have reheard and reversed the former decree; and for its failure to do so, the final decree should be reversed,' and the former decree be now reheard and reversed.”
That a decree of the Court of Appeals which has been certified to and entered as the decree of the court below may be reviewed and corrected, or reversed, on a bill of review filed in the latter court, founded on new matter, seems to be true. Although it is strange that no case, as we believe, is to be found in our reports in *674 which the question has been expressly decided. There are a few cases, however, from which it may be inferred that such a proceeding is lawful. As in the case of Campbell v. Price, &c., 3 Munf. 227, the court, in its opinion, said that after a decree of affirmance by the Court of Appeals, a bill of review cannot be received on the ground of any error in the decree, which is appa- . rent on the face of the record: Thus leaving it to be inferred that there might be a bill of review in such a case founded on new matter. In the case of McCall v. Graham, &c., 1 Hen. & Munf. 13, such a bill of review was filed; but the chancellor held that it ought not to have been received, because “the new evidence now produced does not materially vary the case from its aspect at the former hearing Hor does it satisfactorily appear that the complainant could not have produced it then; indeed, the same or similar evidence must have been in her knowledge then.” And in Randolph's ex'or v. Randolph's ex'or, &c., Id. 181, a special court of appeals held “that the bill of review ought not to have been received or allowed by the High court of Chancery, as it does not show any new matter, or disclose or refer to any new evidence, sufficient to ground a bill of review or reversal of the decree prayed to be reviewed and reversed; nor does the new evidence produced in any manner warrant such review and reversal:” thus not denying the competency of the court below to allow such a bill of review if the ground had been sufficient.
But while it is no doubt true, that a bill of review may be allowed in such a case, the fact that there have been so few cases in our courts in which a bill of review has been received in such case ; and none, we believe, so far as our reports show, in which a decree of this court has been reversed on a bill of review, shows that the greatest caution should be observed in such cases, and the new matter, to be sufficient ground for the reversal of the decree, ought to be very material, and *675 newly discovered, and unknown to the party seeking relief at the time the decree was rendered, and such as he could not then have discovered by the use of reasonable diligence. This is necessary even in an ordinary case of a bill of review of a decree of the same court in which the bill is filed, on the ground of new matter. A fortiori, it must be necessary, when the object is to reverse a decree of the Court óf Appeals, in favor of the finality of which there are so many reasons founded on public policy and convenience.
This being the state of the law and our decisions on the subject, we now proceed to enquire, whether a case is made out by this record for a reversal of the former decree of this court, upon the ground of newly discovered matter ?
In this case no bill of review has ever been filed. To reverse a final decree, even of the court below, on the ground of newly discovered matter, a bill of review is necessary; and such a bill can only be filed by leave of the court, and must be sworn to. A fortiori, are these precautions necessary, when the decree sought to be reversed is that of the court of last resort. There was a •cross bill filed in July 1859, about a year after the decree of the Court of Appeals ; but that bill was neither sworn to, nor filed by leave of the court. It has been treated in the argument of the counsel for the appellants as substantially a bill of review. Let us so consider it, for the purposes of this case, and see if it presents sufficient grounds for the review and reversal of the former decree of this court.
Now, this bill does not state any material fact occurring since that decree, nor any new matter since then ■discovered which could not by the use of reasonable diligence have been discovered before, and which could have had any effect in producing a different decree if it had then been in the record. The only grounds on which it ■can be said to claim relief as a bill of review are : 1st. *676 That the plaintiffs in the original bill, the executors of Alcinda C. Campbell, in a few days after the alleged assignment and delivery of the notes and bonds of her •husband, James B. Campbell, and in his lifetime, had full knowledge of said assignment and delivery, and at the time of their'qualification well knew that said notes and bonds were no part of the personal estate of said James B.; and that the complainants in the cross bill had a right to a full discovery from the said executors as necessary for their defence to the original bill; and, 2dly. That Benjamin B. Campbell, having drawn the said assignment, and the will of James B. Campbell, was alone cognizant of material facts affecting the validity of said assignment; that he had an interest in the subject which deprived the complainants of his testimony on the former hearing of the cause in the court below ; that they had no means of restoring his competency, which could only be done by his own voluntary release; that since the decision of the cause in the Court of Appeals, said Benjamin B. had voluntarily released and surrendered all interest which he had in the subject by his deed duly executed and exhibited with the cross bill; and that the complainants in that bill had then a right to the testimony of said Benjamin B., which would fully explain and prove the assignment and delivery of said notes .and bonds; facts of which he alone was cognizant, and which could not he established so long as he thought proper to retain an interest in the cause.
As to the first of these two grounds, a complete answer to it is, that whatever knowledge the executors of Alcinda C. Campbell may have had in regard to the assignment and delivery of the notes and bonds aforesaid, the fact of such knowledge was known to the complainants in the cross bill before the decree in the original suit was rendered; or, at all events, it is not pretended in the cross bill that said complainants discovered that fact, for the first time, after such decree; and the cross bill *677 might, and ought, therefore, to have been filed before such decree, instead of after the decree of the Court of Appeals.
And as to the second of the said two grounds, a complete answer to it is, that it is not pretended in the cross bill that the complainants did not know before the original decree was rendered, what facts material to the case were within the knowledge of Benjamin B. Campbell, or that he then refused or was unwilling to release his interest in the subject of controversy ; and the complainants should not be allowed to take their chances for obtaining a decree without the evidence of said B. B. Campbell, and, failing in that, to have the benefit of the said evidence to reverse the decree of the Court of Appeals. Another complete answer is, that though the release executed ' by B. B. Campbell may have been sufficient, if it was, to divest him of any interest in the notes and bonds, it certainly did not release him from his liability to the executors of Alcinda C. Campbell for the devastavit committed by him in regard to said notes and bonds, which liability could only be released by the said executors themselves. He therefore still remained an incompetent witness after the execution of said release.
The only grounds relied on in the cross bill for a review of the said decree being wholly insufficient, the Circuit court, therefore, in May 1861, properly dismissed the said cross bill, so far as it was intended as a bill for review or rehearing of the said decree.
But there is another ground, not taken in the cross bill, upon which it was contended that there should be a rehearing and reversal of said decree ; and that ground is thus presented in the additional brief for the appellants, being the fourth of the grounds there taken : “ That the examination of the defendants on interrogatories, gives to their answers the force and effect of answers to bills of discovery, and renders the whole of *678 those answers evidence in the cause, such as, taken in connection with the other facts in the cause, required a rehearing and reversal of the former decree, which it was error to refuse.”
It would be a novel proceeding for the court below to’ review and reverse a decree of the Court of Appeals, without any bill of review at all, and merely upon evidence subsequently taken in the cause ; however strongly that evidence might tend to show that such decree was erroneous.
But there was no such evidence which could be used for any such purpose, even if it had been duly presented in a bill of review ; and indeed, we think, there was no evidence which can be said to be in conflict with the decree of the Court of Appeals. The most that can be . said is that the whole evidence raised a question of doubt about which there might well be a difference of opinion ; and that this court decided it wrongly in the opinion of the counsel for the appellants. This court distinctly decided that the alleged assignment did not operate as a .valid gift of the notes and bonds aforesaid, so as to bar the widow from recovering her distributive share thereof; and that the said notes and bonds were to be regarded! as a part of the testator’s estate, so far as the widow’s right to a distributive share thereof was concerned. And nothing remained to be done after -that decree, but to carry it into execution, by taking the proper accounts, following the assets into the hands of those to whom they may have been delivered by the executors, and to subject the said executors and their securities to liability for the amount which might be found to be due to the representatives of the widow. And the decree, after deciding the question in controversy in the cause, merely gave the necessary directions for carrying the decree into execution as aforesaid. Among those directions, leave was “ given to the appellants-to propound to the appellees and each of them such interrogatories as. *679 may be pertinent and material to take the account according to the principles of this decree.” The appellants availed themselves of this leave, and propounded many interrogatories to the executor of James B. Campbell and his other brothers ; but they were all propounded alone with the view of ascertaining, not whether the alleged assignment of the notes and bonds was valid or not, for it had. been already decided.in the case to be invalid : but what notes and bonds were the subject of the said alleged assignment ; what was their amount; when and how they had been distributed among the parties who had claimed them ; which of them had been collected, and when ; which of them remained uncollected, and why ; what was the present condition of them, &c., &c. ? All such enquiries were “pertinent and material to take the account according to the principles of the decree.” The defendants had no right to avail themselves of these questions for the purpose of making such answers as might tend to show the validity of such assignment, and then rely on those answers as a ground for reversing the decree of this court. Such answers were impertinent and immaterial, and were not according to the principles of the decree. They tended to disprove what had been conclusively settled by the decree, and what was res adjudicatain the cause. Take, for instance, the 5th interrogatory and answer thereto, which were specially noticed in the argument. The 5th interrogatory was, “Did you not receive from James B. Campbell, during his last sickness or shortly before, bonds, notes, claims, accounts or other assets or moneys due from yourself or others to him, or a surrender of debts, bonds or accounts or claims due from you to him. If you did, render before said commissioner a full and minute account thereof in writing?” To that question, Thomas Campbell’s answer was: “I did receive from J. B. Campbell during last sickness notes and bonds,” &c., “butall his right and title to the same he conveyed to me by an assign *680 ment and delivery of said bonds to me,” &c. Now the latter part of this answer was irrelevant, and not responsive to the question according to its well understood meaning, and might have been stricken out, and must be disregarded as if it had not been made. Such an answer can certainly afford no grouud for reversing the decree of this court.
"We have said, we think there was no evidence in the cause in conflict with the decree of this court. None of it seems to be in conflict with the idea that if the testator intended to make any gift at all of his notes and bonds independently of his will, it was a gift intended to operate, not inter vivos, but causa mortis. To the validity of each of these gifts, delivery of possession is necessary. But a gift causa mortis, being revocable at the pleasure of the donor in his lifetime, is not effectual against the right of the wife of the donor to a distributive share of his personal estate. The decree of this court was that the alleged assignment did not operate as a valid gift of the notes and bonds in the lifetime of the testator, so as to bar the widow from recovering her distributive share thereof. The gift might not operate as a valid gift for that purpose, either because there was no delivery of the notes and bonds, or because, there having been such a delivery, it wras in execution of a gift causa mortis. “It appears,” said this court in its opinion delivered when the said decree was pronounced, “that - there was no such absolute and irrevocable gift and parting with possession, as to constitute a valid gift inter vivos. The facts do not prove that at the time the testator intended to part with all dominion over the. subject. The testator was in his last illness ; a disposition of property made under such circumstances is most likely to be testamentary, unless the contrary clearly appears.”
We think the record affords no ground for reversing the former decree of this court, and that the same ought still to remain in full force.
*681 "We now proceed to consider the other errors assigned in the petition and the briefs, or such of them as it may be material to notice.
As to the dismission of the cross bill so far as it was intended as a bill of review, we have already said that the Circuit court did not err in that respect. Nor would it have erred if it had dismissed that bill out and out. There was no occasion for it for any purpose. ' But the cross cause seems to have been in effect dismissed, as no further notice seems to have been taken of it since the decree at May term 1861.
As to the third assignment of error in the petition, that “the court erred in rejecting the application of your petitioners for leave to take their depositions, under the provision of the act of Assembly passed February 7th, 1867,” it is sufficient to say that it does not appear that such application was rejected, or even acted upon by the court; and it was admitted by the counsel for the appellants that this assignment of error is unfounded in fact.. It will not, therefore, be further noticed.
As to the fourth assignment of error in the petition, that “the court should have sustained the thirteenth (meaning the third) exception of your petitioners to Commissioner Myer’s first report.” That exception is in these-words: “3. Because said commissioner did not, as requested by the executors of said J. B. Campbell, credit them with $37,000 funded by them in pursuance of the act of Assembly passed 5th March, 1863. See petition for leave to fund, with the proper endorsement of the judge thereon, together with the bonds procured, here exhibited as part of this exception, marked' Z. The said act of Assembly was passed for the relief of fiduciaries situated as the executors of J. B. C. were, and they1 availed themselves of the benefit of it, in order to place the said sum of $37,000 at the control of the court, for the special purpose of meeting the claim of *682 A. 0. Campbell’s executors and legatees, should it be ultimately decided that they are entitled to it, the proceedings having been regular in all respects, and the funding in accordance with the requirements of the statute. The executors should have been credited with the amount of said bonds as so much disbursed by them under the authority of said statute.”
This exception presents one of the most important questions arising on this record, looking to the large amount involved. The act of March 5th, 1868, under which the alleged investment is claimed to have been made, enacted “that whenever any guardian, curator, committee, executor, administrator, or other fiduciary or trustee, may have in his hands' moneys received in the due exercise of his trust, belonging to the estate or trust fund held by him as fiduciary or trustee, which moneys any such fiduciary or trustee may, from the nature of his trust, or for any cause whatever, be unable to pay over to the cestuis que trust, or parties entitled thereto, it shall be lawful for such fiduciary or trustee to apply, by motion or petition, to any judge of a Circuit court in vacation, for leave to invest the whole or any part of such moneys in interest-bearing bonds, or certificates of the Confederate States, or of the State of Virginia, or any other sufficient bonds or securities of or within the said State; and the said judge may, in his discretion, grant such leave. The bonds, when practicable, shall be taken in the name of such fiduciary or trustee in his fiduciary character; and whenever such investment shall be made, such fiduciary or trustee shall be released from responsibility for the moneys thus invested ; but it shall be his duty to preserve the bonds thus taken, and to exercise due diligence in collecting the interest accruing thereon and in making a proper application thereof; provided, that nothing herein contained shall authorize said fiduciary or fiduciaries to change the character of an existing investment, nor any *683 investment made under the pi’ovisions of this law, until authorized by the decree of a Circuit court of competent jurisdiction; and provided further, that the provisions of the foregoing section shall not be so construed as to interfere with the powers now exercised by courts of chancery over the subject.” Acts of Assembly 1862 and 1863, p. 81.
On the 18th of June 1863, Thomas and B. B. Campbell presented a petition to Judge Thompson, of the Eleventh Judicial Circuit (not embracing the county of Highland), praying for an order permitting them to invest the assets in their hands as executors of J. B. Campbell, in accordance with the provisions of the said act of March 5th, 1863. In their petition they referred to this suit; stated that the object of it was to ascertain» what amount of assets proper went into their hands, and who was properly entitled to the same; that there had been no decision of the cause; that one of the exeeutorsof Alcinda C. Campbell was dead and the other lived out of the country, &c.; and that the petitioners had a large amount of assets in their hands as executors, and were so situated that if it were ascertained what was properly due from them, there was no person to whom they could safely pay any part of it.
This petition was sworn to by B. B. Campbell, one of the petitioners, and on the same day Judge Thompson, in vacation, by an endorsement on the petition, granted leave to the petitioners to make the investment accordingly.
Under the act of Assembly, petition and endorsement aforesaid, the investment of $37,000 in Confederate bonds, referred to in the appellants’ third exception, is claimed to have been made by them ; and the question is, whether they were entitled to credit for the same, as they insisted, against such distributee or distributees as had not received his or her distributive shares; in other *684 words, against the representatives of the widow of James B. Campbell?
At the time the investment was made Confederate money was greatly depreciated in value below its nominal amount, and property of almost every kind was sold at greatly inflated prices. The manifest object of the executors of James B. Campbell and their brothers was to relieve themselves of the heavy debt they owed his widow or her representatives, by preparing to pay the same in Confederate notes or bonds at par. The act expressly provided that wherever a fiduciary had in his hands moneys received in the due execution of his trust, which from the nature of his trust, or any cause whatever, he was unable to pay over to the parties entitled thereto, it should be lawful for him to apply by motion or petition to any judge, &c. The money was required to be in hand, and to have been received in the due exercise of his trust, and he, for some cause, must be unable to pay it over to the parties entitled. These three conditions must have concurred to give a judge in vacation lawful power, on an ex parte motion or petition ■of a fiduciary, to grant him leave to make an investment of the trust fund. Accordingly the petitioners in this case framed their petition with a view to show that the required conditions existed in regard to the investment they asked leave to make. But the record shows ithat none of these conditions in fact existed in the case.
In the first place they said, at least by strong and plain implication, that the controversy involved in the suit brought against them by the executors of Alcinda C. •Campbell had not been decided ; whereas that controversy had been decided by this court in 1858, nearly five years before the petition was presented. That decision was that the notes and bonds in controversy were part of their testator’s estate ; and his widow’s representatives *685 became thenceforward clearly entitled to a distributive share of that estate, including the notes and bonds as part thereof. They had then had about six years since the death of their testator for the collection of his assets, and ought then to have had a large fund in hand for distribution. It was their duty to have proceeded with due diligence after that decree to collect the assets of the estate, including the notes and bonds, which still remained outstanding, pay off the remaining debts of the estate, if any, and distribute the surplus among the parties entitled thereto, and at all events pay the distributive portion of the widow. Had they done so, they probably might, before the war commenced, have settled up the estate and paid the widow’s portion of it. Instead of that, although her husband died twenty years ago, leaving a personal estate worth from fifty to a hundred thousand dollars, to one-half of which she was entitled, she and her representatives have, to this day, received nothing but the few articles she carried with her when she went away from his house, after his death, and a small sum of money paid her. by the executors about that time. The only step which they seem to have ever taken towards a settlement of her distributive share of the estate was the investment which they made in Confederate bonds for that purpose in 1863-’4.
In the second place, they said in their petition that they had a large amount of assets in ffheir hands as executors, meaning, of course, moneys received in the due execution of their trust, according to the language of the act. Whereas they had no assets, or at least no moneys, in their hands as executors. They had divided the notes and bondsamong themselves and their brothers a short time after their testator’s death. They thus converted the subject to their own use, and became debtors to the estate on that account. The money invested in Confederate bonds, or nearly all of it, was raised after the order for investment, and by contributions made by *686 the brothers among themselves for the purpose; and they generally derived the sums they contributed, or the ■ greater part thereof, from the sale of real estate—of coui’se at the inflated Confederate prices of the time. For the vaTueof the notes and bonds alleged to have been assigned by the testator to his brothers, his executors and their securities were liable. And the brothers were also liable for the portions received by them respectively in the distribution of the notes and bonds made among themselves. The debt to the estate on account of these notes and bonds was therefore most amply secured. And it was a devastavit to call in that debt or any part of it, for the pui’pose of making an investment in Confederate bonds. The investment act contained an express proviso, that nothing therein contained should authorize a fiduciary to change the character of an existing investment.
In the third place, they said they were so situated that if it were ascertained what was properly due from them, there was no person to whom they could safely pay any part of it. They could certainly have paid it to the representatives of the widow before the war, if not to their counsel during the war. "Why did they not raise the money by contributions among themselves and pay it before the war, when money was good, instead of raising it in the same way and investing it in Confederate bonds during the war, when money was very bad ?
Certainly Judge Thompson would not have made the order he did if he had known the facts. And the executors of J. B. Campbell not having informed him of the facts, as it was their duty to have done, they can derive no benefit from the order, and, the- same is null and void as to the representatives of the widow.. It does not appear that they or their counsel had any intimation of the fact of the investment until after the war. It would have been a very easy matter to have given notice of the fact, at least to .their counsel.
*687 As to the sums of $1,200 received of Pullius, and $2,500 received of Stephenson, by the executors, in the summer of 1868, in Confederate notes, which constituted part of the said investment, and which their counsel insist were received, in the due exercise of their trust, we think, for reasons already assigned, that they had no right to receive the said sums for the said purpose, and therefore did not receive them in the due exercise of their trust.
Surely it cannot be necessary to say anything more for the purpose of showing that the said executors are not entitled to be credited with the amount of said investment, at least so far as the widow and her representatives are concerned. And we are of opinion that the said third exception was properly overruled.
. [The judge then proceeded to consider the other exceptions to the commisioner’s report; but as they relate to mere matters of fact, this part of the opinion is omitted. He then proceeded as follows :]
We have thus disposed of all the appellee’s exceptions to the reports of Commissioner Myem ; but they complain of other alleged errors in the prior proceedings in the cause, some of which at least it is now proper to notice.
In the first place, they complain that the court erred in not dismissing the appellants’ cross-bill and bill of review, out and out. We have already sufficiently noticed this subject.
In the next place, they complain that the opinion of the court, which formed a part of the order of the 15th of March 1861, recommitting the cause to Commissioner Strickler to modify the report of Commissioner Stephenson, in conformity with the principles and instructions embodied in the said order, was erroneous in several respects. And
1st. That the instructions of the court overruled the second exception of the appellees to Commissioner *688 Stephenson’s report, for allowing commissions to the appellants, when they never made any settlement at all.
That said second exception to Commissioner Stephenson’s report, which -was filed on the 24th of March 1860, was not renewed to Commissioner Myers’ report, which was filed on the 24th of April 1867 ; nor was there any exception to the latter report on account of commission allowed to the executors of J. B. Campbell, although exceptions were taken by the appellants to that report on ether grounds. Conceding, for the purposes of this case, that their failure to renew their exception on that ground, to Commissioner Myers’ report, was not a waiver of it; let us enquire: 1st. Whether there was any error in the said opinion of the court in that respect ; and if not, then 2ndly. Whether the report-of Commissioner Myers does not conform to the instructions of the court in regard to commission ; or, at least, must not be considered as having so conformed, in the absence of any exception to the said report for non-conformity ?
1st. Was there any error in the said opinion of the court in regard to commission ?
That opinion is as follows : “As to the allowance of commission to the executors, the court is of opinion, that unless a statement of receipts other than those embraced by the assignment, was within six months after the expiration of any year, laid before a commissioner by the executors, no commission should be allowed them thereon, unless such statement was given by them to-those entitled to the money and it was actually settled with them. As to the notes and bonds included in the-assignment, the executors of J. B. Campbell did not regard them as assets, until the decree of the Court of Appeals, and they could not properly be regarded as received by them in that character prior thereto. If a statement of the receipts thereof was laid before a commissioner in this suit, who was directed to settle the same, within twelve months after such decree, then com *689 mission should be allowed. In other words, the court recognizes that the defendants ought not to be regarded as in default, aud liable to forfeit their commission on the assigned paper, until it was declared by the Court Appeals to be assets ; that all the receipts prior to that day by their transferees should, as of that date, be held to be in the hands of the executors; and that if they complied with the provisions of the statute then, their commission is not forfeited. The same principle will apply to any subsequent receipts.”
Now we see nothing in this opinion which we consider erroneous. There is nothing in the record to show that the executors and their brothers did not act bona fide in claiming the notes and bonds under the assignment, until the Court of Appeals decided that the assignment was null and void as to the widow of the testator. He had an undoubted legal and moral right to give away his notes and bonds by a completed gift inter vivos, and thus to give them away for the purpose of preventing his wife from succeeding to half of them as his distributee. He attempted to give them to his brothers, who, with his wife, were his only next of kin, and she was in her last illness of consumption. Whether the gift was valid or not against the wife, was the only question in the case; and that was a pure legal question. Thomas Campbell received and held the notes and bonds as assignee, and not as executor, though he was one of the executors, and he made a division of them between himself and his brothers, in pursuance of what he, no doubt, honestly supposed to be a valid trust reposed in him by the donor. A suit was in due time brought by the executors of the widow, to test the validity, as against her, of the assignment. That suit was in due time tried in the Circuit court, which decided in favor of the validity of the assignment. The executors of the widow appealed from the decree of the Circuit court; and this court reversed that decree and decided against *690 the validity of the assignment, and ■ that the notes and bonds were part of the testator’s estate, of which his wife was entitled to a distributive share. Until the decree of this court the question of title to' the notes and bonds was undecided, and they were not in the hands of the executors as such. They could not, until then, be brought into their executorial accounts. They were not in default for not having themselves brought a suit to have the question decided earlier. A suit for that purpose was brought in due time by the conflicting claimant, and there was no want of diligence in the executors in regard to the subject until after the decree of the Court of Appeals in August 1858. Then there was no error in the opinion, that the notes and bonds should not be considered as part of the estate in the hands of the executors until after the decree of this court. hTor do we think there was any error in the said opinion as to the right of the executors to commission afterwards, or as to their duties and the means to be used by -them to avoid a forfeiture of their commission. "We see no error in the opinion, in any respect, in regard to commission. Then,
2dly. Does not the report of Commissioner Myers conform to the said opinion in regard to commissions; or, at least, must it not be considered as having so conformed in the absence of any exception to the said report for non-conformity?
Commissioner Stephenson commenced the taking of the account decreed to be taken by the Court of Appeals in due time thereafter, and there is nothing in the record to show that the executors did not place their accounts and vouchers in his hands in full time to be entitled to commission, according to law and the prin.ciples settled by the said opinion of the court. It is said there were other assets which came to their hands besides the notes and bonds, on which they forfeited their commission. Those other assets hnust have been of *691 small amount. But there is nothing apparent on the record which enables us to say with certainty that the executors incurred a forfeiture iu regard to any of their commission, and we must, therefore, say that they conformed to the law, in the absence of any exception to the report of Commissioner Myers for non-conformity. The executors were certainly entitled to some commission. They did not forfeit all, if any. Which did they forfeit? The appellees should have laid their finger upon it by an exception. There was no such exception. And we, therefore, think, that no objection can now be taken here to the allowance of commission made to the executors by Commissioner Myers.
Without specifying the other objections made by the counsel of the appellees to that opinion, it must suffice to say that we do pot consider them well founded, or that they, or any of them, ought to be sustained.
TJpon the whole, we think that the decrees appealed from should be reversed, so far as they are considered erroneous in the foregoing opinion, and such decree rendered in lieu of the portions reversed as is required by the said opinion, and should be affirmed in all other respects, with damages according to law and costs to the appellee, John W. Hedges, surviving executor of Alcinda C. Campbell, as the party substantially prevailing.
The decree was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that there is no error in the decree appealed from to the prejudice of appellants, Thomas Campbell and Benjamin B. Campbell, either in their own right or as executors of James B. Campbell, or of their brothers, the appellees, John Campbell, Samuel 0. Campbell, William M. Campbell, A. Hanson Campbell and Edgar Campbell. But the court is further of opinion, for reasons stated as aforesaid, that *692 there are errors in said decree to the prejudice of the appellee, John ~W. Hedges, surviving executor of Aleinda C. Campbell, as follows, to wit;
1st. The said Circuit court erred in overruling instead of sustaining the appellee’s first exception to Commissioner Myers’ first report. “That on page 24 of said report he has credited the estate with $330.12, instead of $725.12, cash received of 'Wm. Skeen, receiver;” and in overruling, instead of sustaining, the appellee’s renewal of that exception to Commissioner Myers’ second or amended report, such renewal being embraced in their first exception to said second report. It appears from a receipt of Thomas Campbell, one of the executors of James B. Campbell, to said Skeen, receiver, at pages 385-6 of the record, that $725.12 was the true amount received.
2d. As to the appellee’s second exception to Commissioner Myers’ first report renewed in their first exception to his second report; “because the commissioner has failed to charge the executors with the new list of bonds-filed with the late answer of Thomas Campbell since Commissioner Strickler’s last report, and headed “A list of J. B. Campbell & Co.’s bonds assigned to Thomas Campbell and believed to be insolvent or not collectable, amounting as added up at the foot to $8,012.87.” Although it was proper not to charge the executors with the whole amount of the bonds included in the “new list ” referred to in the exception, yet, as since that list was filed in 1861, some of the said bonds may have been collected, or, as some of them may now be collectable, there ought to be an enquiry and account by a commissioner to ascertain the facts. The court, therefore, erred in overruling the said exception, and, instead of doing-so, in not dh’ecting such an inquiry.
3d. As to the appellee’s second exception to Commissioner Myers’ second or amended report; that is, “to the allowance made by the commissioner in his said *693 second report of eredit to the executors, on the first page of said report, for each and every of the items numbered 1, 3, 4, 5, 6, 7, 8, 9 and 13, amounting in the aggregate to $2,673.88 of principal and $122.67 of interest.” These items here numbered were items' of charges to the executors in Commissioner Myers’ first report; to which items the appellants excepted, and their exceptions to which were sustained by the court below.
The said items are designated by the same numbers in. a statement on page 43 of Commissioner Myers’ first report, copied on page 740 of the printed record. Commissioner Myers, having accordingly, in his second report, given credit to the executors for those items, the appellees, on their part, excepted to the amended report on that account. "We will have to take up and dispose of the items as they are above numbered.
No. 1. Price of mule sold by S. M. Lightner and accounted for to executors. Credited to the estate of J. B. Camphell in 1853 in Commissioner Myers’ first report, page 2.
The Circuit court erred in sustaining the appellants’ exception to this item in Commissioner Myers’ first report, and in overruling the appellee’s exception to the Bame item in the said commissioner’s secondjeport. The item is a proper credit to the estate.
No. 3. Bond of John Ginger, due 29th January 1841, and interest.
No. 4. Amount of two bonds on John Malcomb.
No. 5. Amount of two bonds of Thomas Bird, to be credited on John Lamb’s bond.
Instead of sustaining the appellants’ and overruling the appellees’ exceptions in regard to these three items (Nos. 3, 4 and 5), the Circuit court ought to have referred the subjects of them to a commissioner for further enquiry and account, and erred in not doing so.
No. 6. Balance due from D. G. Kinkead, 20th June 1850, as per statement of J. B. C., $185.53, and in *694 terest to January 10, 1860, when renewed by W. M. 0., $108.21.
This debt is included in William M. Campbell’s list of bonds, and is not included in his list of insolvents which he returned under oath February 7, 1860. The presumption, therefore, is that it has been collected, or is a good debt. It was renewed March 10, 1860, for $274.09, which seems to be less than the amount of debt and interest due on that day, the difference, no doubt, having been paid when or before the new bond was given.
The Circuit court erred in sustaining the appellants’ exception to this item in Commissioner Myers’ first report and in overruling the appellees’ exception to the corresponding item in Commissioner Myers’ second report. The item is a proper credit to the estate.
Ho. 7. Bond of Marshall and Cunningham, due 1st March 1851, and interest.
The appellants’ exception to this item was sustained as to all over $227. The appellees insist that it ought to have been overruled altogether. Instead of sustaining the appellants’ and overruling the appellees’ exception as to the excess of said bond over the said sum of $227, the Circuit court ought to have referred the matter of such excess to a commissioner for further enquiry and account, and erred in not doing so.
Ho. 8. Bond of J. J. Cooper, due August 1st, 1844, and interest.
Ho. 9. Bond of II. Michael and interest.
These two items (Hos. 8 and 9) are proper credits to the estate, and the Circuit court erred in sustaining the appellants’ and overruling the appellees’ exceptions in regard to the said two items.
Ho. 13. Yalue of shares in the estate of Wm. Dinwiddie, deceased, on the 19th day of June 1861, $4,342.39.
The appellants’ exception to this item was sustained as to all over $2,500. The appellees insist that it ought *695 to have been overruled altogether. There is nothing in the record which shows that the executora are chargeable with more than.$2,500, which they actually received on account of said interest. Instead of sustaining the appellants’ and overruling the appellees’ exceptions as to the excess of the value of said shares over the said sum of $2,500, the Circuit court ought to have referred the matter of such excess to a commissioner for further enquiry and account, and erred in not doing so. Therefore it is decreed and ordered that so much of the said decree appealed from as is inconsistent with the foregoing opinion and decree, be reversed and annulled, and the residue thereof affirmed, including in such affirmance that portion of the said decree of the 29th day of September 1867, which adjudged, ordered and decreed that the said Thomas Campbell and Benjamin B. Campbell, the executors of J. B. Campbell, do, out of their own estates, pay to the said John W. Hedges, as surviving executor of Alcinda C. Campbell, deceased, the sum of thirty-three thousand eight hundred and sixty-two dollars and twenty-nine cents, with interest on twenty-five thousand and twenty-three dollars and thirty-nine cents, part thereof, from the 20th day of January 1861 till paid ; the amount due by said Thomas Campbell and Benjamiu B. Campbell to the said John ~W. Hedges as surviving executor of Alcinda C. Campbell as aforesaid, being increased by this decree, and being therefore greater than the said sum of money and interest decreed to be paid by the said decree of the 29th day of September 1867, as aforesaid. The payment of which sum of thirty-three thousand eight hundred and sixty-two dollars and twenty-nine cents ($33,862.29), with interest on twenty-five thousand and thirty-three dollars and thirty-nine cents ($25,033.39), part thereof, from the 20th day of January 1861 till paid, together with the costs and damages hereby decreed in his favor, the said John W. Hedges, as surviving executor of Al *696 cinda C. Campbell, deceased, is to be at liberty to enforce forthwith, without waiting for the making of the enquiries and taking of the accounts hereby directed to be made and taken.
And it is further decreed and ordered that the appellants, Thomas Campbell and Benjamin B. Campbell, executors of James B. Campbell, do, out of their own estates, pay to the appellee, John W. Hedges, surviving executor of Alcinda 0. Campbell, deceased, damages according to law and his costs by him about his defence in this behalf expended. And the cause is remanded to the said Circuit court for further preceedings to be had therein in conformity with the foregoing opinion and decree. Which is ordered to be certified to the said Circuit court of Highland.