CHRISTIAN, J.
delivered the opinion of the court.
This is an appeal from a decree of the Circuit court of Augusta county. The record discloses the following facts: Peter Crickard, late of said county, departed this life on the 15th day of August, 1857. He left a will, which was duly admitted to probate in the County court of said county, and which disposed of a large estate, real and personal. He appointed as an *executor and executrix Henderson M. Bell and his wife Rose Ann Crick- *433 ard. His wife having- renounced the provisions of said will, and also her right to act as executrix, Bell became the sole executor, and proceeded to administer the estate of his testator, and to execute the trusts imposed by said will. The testator directed a sale of the whole of his real and personal estate, except a small portion of his real estate, which was specifically devised. Leaving no issue, he gave numerous legacies to his collateral kindred, and directed that his executors should invest the sum of $6,000 in bank or state stocks, or well secured bonds, for the benefit of his wife. His wife having renounced the provisions of the will made for her, and claiming her dower in the real estate of the testator, negotiations were entered into between her and the executor, by which it was agreed that she would receive her interest in the purchase money, instead of having dower assigned to her in the real estate. The widow, although renouncing the provisions of the will made for her, expressed the desire that her husband’s disposition of his estate might be carried out as nearly as possible, notwithstanding her renunciation of the will.
On the 20th July, 1857, the executor, Henderson M. Bell, filed his bill in the Circuit court of Augusta, setting forth, that before the renunciation of the will by the widow they had sold a part of the real estate; but that before the expiration of twelve months after the probate of the will Mrs. Crickard had appeal red in open court and renounced the provisions of the will made for her by her husband, and resigned her executorship of said will. He filed with his bill her agreement in writing, by which she stipulated that the said executor should proceed, in execution of the will, to make sale of the real estate directed by said will to be *'sold, free from all incumbrance of her dower, upon condition, that the executor’s proceedings under said will should be reported to a court of competent jurisdiction, and that she should receive a fair equivalent for her right of dower in the whole real estate, and her distributive ■share in the personal estate and slaves of said Peter Crickard, deceased. His bill prays, that the court will ascertain and assign to Mrs. Crickard, either in kind or by proper commutation, her dower right in the real estate of her husband, and her distribution in the slaves and other personal property left by him. He also asks that his accounts as executor may be referred to one of the commissioners of the court, who may be directed to state and settle the same; and that said commissioner be also directed to distribute among the several legatees under the will such portions of his estate as may appear to be in the hands of the executor, and also such portions as might be thereafter realized, upon such principles and terms as to the court might seem equitable and proper to direct.
Under certain proceedings in this suit, the commuted cash value of the dower right of Mrs. Crickard was assigned to her, and an account of the transactions of the executor was settled before a commissioner of the court.
This account showed a balance in the hands of the executor of $9,543.48, on the 1st day of September 1859. No further proceedings connected with the matter now in controversy were taken in the cause until the 9th day of June 1863, when the executor filed the following petition: “To Hon. L. P. Thompson, judge. Your petitioner, Henderson M. Bell, executor of Peter Crick-ard, deceased, respectfully represents to the court, that he holds in his hands, *under the will of said Peter Crickard, certain funds for the benefit of his legatees, as follows;” and then follows a list of the names of the numerous legatees, with the amounts due to each severally, the whole amounting to the sum of $7,078.86; “which he asked the authority of the court to invest in the bonds of the Confederate States, under the act of the general assembly of Virginia in that case made and provided, passed June 9th, 1863.” Signed H. W. Bell, executor of Peter Crickard, deceased. Upon the coming in of this petition, on the same day it was presented, to wit: on the 9th day of June 1863, the following order was entered by the said Circuit court: “On the motion of Henderson M. Bell, the executor of Peter Crickard, deceased, who filed his petition praying leave to invest $7,078.86, belonging to the estate of the decedent, or to the legatees mentioned in said petition, leave is granted to him to make the investment according to the prayer of his petition. ’ ’
In accordance with this order the executor invested in the bonds of the Confederate States, bearing seven per cent, interest, the amount referred to in the petition and order. Whether the parties interested in this petition of the executor had notice of his application, or whether they were present, either in person or by counsel, the record fails to disclose. The presumption is that they had no notice, and were not present or represented by counsel, or the fact would have appeared.
Thus matters stood until after the close of the war, when, on the 10th of January, 1869, an order was entered by the said Circuit court, directing the executor to settle before one of the commissioners of said court an account of his administration of the estate of his testator, Peter Crick-ard. Before any account *was taken under this order, a petition was filed by James Crickard and his children (for wdiose benefit the testator had directed a certain sum to be invested by his executor), together with other legatees of said Peter Crickard, in which said petition, after setting forth the provisions of the testator’s will, the fact that upon a regular settlement of the accounts of the executor made and returned in this cause, and to which no exception was filed, there appeared to be in the hands of the executor for distribution among the legatees on the 1st day of September, 1859, which was to carry interest *434 from that day, the sum of $9,543.48. And after referring' to the order entered upon the motion of the executor in 1863, directing him to make investment in Confederate States bonds, insist that said order was illegal and void, and of no binding force or effect whatever on the petitioners; that the fund received by the executor came into his hands in a sound currency; that having failed either to pay it over, or to invest it, as both the law and the will of the testator required, but retaining it in his own hands, he cannot now discharge his obligation by the worthless securities in which he invested —a currency depreciated at the time of the investment to less than one-tenth of the value of the funds which came into his hands. They further insist that the act of March 1863, under which the order of June 1863 was entered, has no application to such a case; and they pray that the executor may be compelled to account to them for good money, in discharge of the balances ascertained to be due them by the report of the commissioner referred to, with legal interest upon the respective balances from 1st September, 1859; and that the sums ascertained to be due the petitioner, James Crickard and his children, may, under the order of the court, *be loaned out and invested in good real estate securities, in accordance with the trusts and limitations of the will of Peter Crickard, deceased.
They further ask, that if the court deem it necessary or proper for the making up of a more formal issue, that a cross-bill should be filed, then they pray that their petition may be considered, received and read as a cross-bill, and that the said executor may be required to answer its allegations in due form, &c.
On the 6th July 1871, the cause came on to be heard on the papers formerly read and the petition above referred to; and thereupon a rule was awarded against the executor to appear on the first day of the next term to show cause, if any he can, why he should not pay over to the legatees of said Peter Crickard, the balances ascertained to be respectively due to each by Commissioner Hendren’s report, No. 2, filed August 13th 1859, and confirmed by a decree entered on the 30th Nov’r 1859. The executor filed his answer to this rule on the first day of the following term. In this answer he avers that he had fully paid off to all the parties entitled to receive from him the amounts ascertained to be due by the report of Commissioner Hendren, referred to in the order of the court, shortly after the confirmation of said report; that the parties to whom he did not so pay were not competent at the time to receive the amounts reported in their favor; that the amounts which he could not pay over were invested by him according to his best judgment and discretion in the management of his trust, and the interest paid over to the parties entitled, or to their use when they could not themselves receive the same; that the war coming on, these investments became, beyond the control of respondent, converted 'into Confederate money, and on the 9th day of June *1863, respondent being unable to pay over or loan out the money then in his hands, filed his petition in this cause, asking the then judge of the court for leave, under the provisions of the act of assembly passed March 5th, 1863, to invest the funds in the bonds of the Confederate States of America, that being the only investment available. That the leave was granted by the decree entered on the 9th June 1863. Respondent in pursuance of -this leave invested the fund then in his hands in the said bonds, which he now has in his possession. Respondent continued to collect and pay over to the parties the interest’ upon this investment as long as it was available. ’ ’ That “since the close of the war the fund thus invested having been entirely lost, respondent was desirous of making some compromise with these parties. He felt that the loss of the fund was by no fault of his own, but was the result of causes beyond his control; and, although he had lost heavily of his own property, in common with his neighbors, yet he had not lost all. He, therefore, in a spirit of liberality, as he believed, proposed to these parties to divide the loss with them; or in other words, to pay one-half of the amount coming to each of them. That this proposition was accepted by much the larger number of the parties interested (respondent believed by all who were competent to accept), and that respondent has paid over to said parties the full amount coming to them under this arrangement, as he is prepared to show before a commissioner of the court. ’ ’ He expressed his willingness to make the same arrangement with the other parties. After protesting that he is not legally or equitably bound to pay over any portion of the fund which he had invested under the order of the court, he says he is prepared to render such account as the court may *direct. Upon this answer to the rule awarded at the previous term, the court entered a decree directing one of its commissioners “to take an account of the payments made by H. M. Bell, the executor, to the legatees of Peter Crickard, deceased, and how the funds remaining in his hands were and are invested. ’ ’
In execution of this order, the commissioner, to whom the matter was referred, returned to the court several alternate statements,‘Showing, according to the principles adopted by the commissioner in making each several statement, different balances due by the qxecutor to the legatees. The one adopted by the court, as ascertaining the correct balances due from the executor to the legatees, and designated in the decree as “the first alternate statement,” rejected the investment made by the executive in Confederate States bonds, and holding him bound for the amount found due the legatees by commissioner Hendren’s report on the 1st September 1859, to wit: the sum of $9,543.48, gives him credit by the sums paid to the legatees in Confederate money *435 at its face value (it being- for interest and small sums accepted by the parties), and also recognized as a full settlement the compromises which had been made by the parties who were sui juris, reported the balances due to the legatees respectively, which still remained unsettled. The executor excepted to this report, upon the ground that the commissioner failed to credit the executor with the amount invested by him in Confederate bonds. This exception was overruled, and the court entered a decree directing the executor to pay over to the legatees the sums found due to them respectively by said report, exceptas to James Crickard and his children. Eor them the testator had made the following provision in his will: “6th. I give and bequeath to my ^'brother, James Crickard, the house and lot in which he now lives, in the town of Staunton, and the sum of $3,500 in money, which bequest is intended for the use and support of said James Crick-ard and his family during the natural life of said James, and after his death for the use and benefit of his children; and my executors are directed so to invest the said §3,500 as may in their judgment best conduce to the support and comfort of said James and his family, and at his death to distribute the same among his children.”
As to this legacy, the court entered in its decree the following directions: “And James Crickard and his children, who are entitled to the fund created by the sixth clause of the will of Peter Crickard, deceased, having nominated Robert G. Bickle as a suitable person to act as trustee and to take charge of said fund, and the court approving of said nomination, it is therefore further adjudged and decreed that the said H. M. Bell pay to said Robert G. Bickle §3,700.79, with legal interest on $2,561.10, part thereof, from 1st day of June 1872, till paid. But said Robert G. Bickle shall not receive said fund of said Bell until he shall have executed before the clerk of this court bond with good security in the penalty of $9,000, payable to the commonwealth of Virginia, and conditioned for the faithful discharge of his duties in the preservation and management of said fund, according to the trusts imposed by the will of said Peter Crickard, deceased, and subject to all future orders and decrees of this court.”
It was from this decree that an appeal was allowed to this court.
The court is of opinion that there is no error in the decree of the Circuit court.
The law makes it the duty of an executor, after he *has paid the debts of his decedent’s estate, to pay over the legacies bequeathed by the will to those entitled to receive them within a reasonable time.
If the legatees are so situated, or from any other cause, there is no hand to receive the legacies from the executor, then it is his plain duty to invest the fund in safe interest-bearing securities to await the time when the same can be paid over to the legatee. If the executor fails to do this, and retains the fund in his own hands, he thereby becomes a debtor to the legatee, chargeable with legal interest, and he can no more than any other debtor discharge his debt in a depreciated currency when he received a sound currency, but must pay it in the same currency which came into his hands, or in one of equal value.
In the case before us the executor (according to the report of commissioner Hendren, not excepted to., and confirmed by the court,) had in his hands for distribution among the legatees, the sum of $9,543.48, on the 1st day of September 1859. Éor nearly two years before the commencement of the war this fund was in his hands. Why was it not paid over before there was any change in the currency? Or if some of the parties were infants, or so situated from other causes as not to be in a condition to receive their legacies, why was not such portion invested for them in some safe interest-bearing securities, which might have prevented loss both to him and to them? But in June 1863, nearly five years after the fund came into his hands, and which was paid to him in gold or its equivalent, he brings into the Circuit court, in Confederate currency, $7,000, and upon an ex parte order, made without notice to the parties interested, leave is obtained from the court to invest that amount in Confederate bonds, for the benefit of the legatees, who *were entitled to receive payment of their legacies in a sound currency. He is thus permitted to pay a debt of $7,000 in currency worth at the time less than $800.
The executor, both in his petition and answer to the rule, says that he asked leave of the court to make this investment under the provisions of the act of assembly passed March 5th, 1863. The act relied upon has no application to such a case as this. It has already received judicial construction by this court more than once. See Campbell’s ex'ors v. Campbell’s ex’or, 22 Gratt. 649, and Mead v. Jones, supra 347. In the first named case, the president delivering the opinion of the court says, p. 648: “The act expressly provided that whenever a fiduciary had in his hands moneys received in the due execution of his trust, which from the nature of his trust, or any cause whatever, he was unable to pay over to the parties entitled thereto, it should be lawful for him to apply by motion or petition to any judge, &c. The money was required to be in hand, and to have been received in the due exercise of his trust, and he for some cause must be unable to pay it over to the parties entitled.” These three conditions must concur. In the case before us none of these conditions concur, but all are wanting. The money he received for the legatees was not in hand; for that was gold or its equivalent. The Confederate money he proposed to invest in Confederate bonds was not received in the due exercise of his trust. The conversion of gold which he received nearly five years before into Confederate currency, was, no matter how converted, an undue and illegal exercise of *436 his trust, and as to those parties who, from infancy or other causes, were not in a condition to receive it, it was the plain duty of the executor to have made investments *for them before the war, in securities which were safe and valuable. The court is therefore of opinion that the act of March 5th, 1863, did not confer upon the Circuit court any authority to allow the executor in this case to make .the investment in Confederate bonds.
But it is argued by the learned counsel for the appellant, that independent of the act of March 5th, 1863, which is wholly relied upon by the executor in answer to the rule, the court had the authority to make the order of investment entered June 9th, 1863. “That,” to use the language of the petition for appeal, “either by nature of the inherent powers of courts of chancery, or in accordance with the spirit if not the letter of the 24th section of chapter 132, Code 1860, it appearing to the court from the report filed and its own decree, that the moneys specially mentioned in the petition filed on the 9th June 1863, were in the executor’s hands, the court had power and jurisdiction to order said moneys to be paid into court, to be invested or loaned out, or to make any order respecting the same which to such court might seem proper.” And it is insisted that the order having been entered in a pending cause, to which the legatees were parties, and having been made by a court of competent jurisdiction, having the parties before it, and having control of the fund, must stand until set aside upon a petition for fe-hearing and review, or reversed upon appeal.
The conclusive answer to this position is, that the petition filed by the legatees, which is the foundation of all the proceedings against the executor, must be treated as it is in effect a petition to review and set aside the order of June 9th, 1863. The very object of that petition was to get rid of that order, which alone *stood in the way of recovery against the executor, by showing that it was illegal and void; and the decree of the court appealed from is in effect a review and rescission of that order. The decree of the Circuit court makes special reference to that order, and in effect overrules and sets it aside, when it says: “The court is also of opinion that the said Bell received the assets of his testator’s estate in t,he year 1859; he ought now to account with the legatees for good money, and the alleged investment in Confederate bonds did not release said executor Bell from his responsibility to the legatees of said estate.” It is plain, therefore, from the petition and decree, that the object of the one and the effect of the other was a rehearing and rescission of the order of 9th June, 1863. It is equally plain that said order was erroneous and ought to have been set aside. It was entered on a petition ex parte in its character, and without notice to the parties interested. It was confessedly and on its face entered on a petition filed under the act of March 5th, 1863; and the court, in the absence of the real facts, might well presume that the funds which the executor asked leave to invest were such as the act authorized to be invested in Confederate bonds; that is, that they were received in the due exercise of his trust, and that he was unable to pay over to the parties entitled. It is inconceivable to suppose that such an order ever would have been entered if it had been known to the court that the Confederate monej' which the executor proposed to invest represented a fund which he had received in gold nearly five years before.
We would not do the slightest injustice to the executor, and therefore will not fail to notice any ground upon which he rests his defence. In his answer, he says “that the amounts which he could not pay over *were invested by him according to his best judgment and discretion in the management of his trust, and the interest collected and paid over to the parties entitled or to their use when they could not themselves receive the same; that the war coming on, these investments became, beyond the control of respondent, converted into Confederate money; and on the 9th day of June 1863, respondent being unable to pay over or loan out the money thus in his hands, filed his petition in this cause, asking the then judge of this court for leave, under the provisions of the act of assembly passed March 5th, 1863, to invest the funds in the bonds of the Confederate States of America.
The executor does not inform the court, though required to do so by its order, in what manner he invested the funds in his hands, which he declares in his answer “were invested by him according to his best judgment and discretion in the management of his trust;” nor does he offer any explanation of how “these investments became, beyond his control, converted into Confederate money.” One of two things is certainty true; and in either event the executor is equally responsible. He either retained the money in his own hands, paying interest to the parties entitled, and regarded it as an investment in his hands for them; or he loaned it out upon securities of some sort. If he retained it, he became the debtor of the legatees; and having received gold, cannot .discharge his debt in a depreciated currency. If he loaned it out he had no right to receive it in Confederate currency, depreciated in June 1863 to one-tenth of its face value. And if he changed the investment he had made, and suffered safe and solvent securities to become “converted into Confederate money,” he committed a ' devastavit, for which the law will hold him responsible. *This has been expressly decided by this court, not only in the case of Campbell’s ex’ors v. Campbell’s ex’or, 22 Gratt. 649, above referred to; but in a number of cases where appeals have been refused, where the record and petition presented this precise question. In any and every view we can take'of the case, the loss consequent upon the investment in *437 Confederate bonds must fall, not on the legatees, but on the executor, who caused this loss by failing to do that which both the law and the will of his testator required at his hands.
In coming to this conclusion, we do not mean in any manner to impute to the executor any fraudulent purpose or misconduct. His high character and standing, well known to this court, as well as his conduct since the loss occurred, in seeking to repair it, and taking upon himself a part of its burden, all repel any such idea.
We mean only, without reference to the motives or conduct of parties, to fix the responsibility where the law places it, and to lay the burthen of the loss upon him who caused it.
There is one other assignment of error which must be mentioned briefly; and that is, that there is error in the decree in appointing a trustee to receive that portion which was due from the executor to James Crickard and his children. It is objected, that inasmuch as the will appointed the executor trustee for these legatees, the court had no power to remove him and appoint another. The record shows that seven if not all of the parties interested, filed a petition to the court asking that Robert G. Bickle might be appointed a trustee to take charge of and manage for them the trust fund created for their benefit by the sixth clause of Peter Crickard’s will. The court *below granted the prayer of their petition and appointed the party whom they nominated as their trustee, requiring of him bond and security for Jhe faithful discharge of his duties.
The court is of opinion that there is no error in this order. A court of chancery having trust funds under its control, may make such orders as may in its opinion be necessary for its safety and proper administration. The manner of doing this must be left in a great degree to the discretion of the court having charge of the fund. If the parties interested desire the appointment of another trustee, and the court thinks it necessary to a proper management of the trust fund, this court will not interfere, although it might think such an order unnecessary. It must be left to the discretion of the court of chancery having control of the fund and charged with its safety and proper administration.
It may be observed, too, that the will did not in terms appoint Bell the trustee; but simply directed him as executor to carry out the provisions of the will in making the investment for James Crickard and his children. So that in point of fact there was no removal of the trustee and appointment of another.
The court is therefore of opinion that there is no error in the decree of the Circuit court of Augusta, and that the same be affirmed.
Decree affirmed.