Moncure. P.
The court is of opinion that the appellant, John H. Crawford, as guardian of the appellee, George T. Shover, committed a breach of trust, by receiving of the appellee, William Crawford, executor of George W. Crawford, deceased, on the 25th .day of June 1863, four thousand five hundred dollars in Confederate States treasury notes in payment and discharge of so much of the legacy of eight thousand dollars, bequeathed by the will of the said testator to his adopted son, the said George T. Shover.
The said legacy, to the extent of the amount thus paid, was, at the time of such payment, perfectly secure; and it would have so remained until actual payment in good 'money, but for the payment in Confederate money as aforesaid. The estate of the said testator had been ascertained, by judicial inquiry, to be ample for the payment of at least that porticm of the said legacy which was thus paid in Confederate money. The said estate being insufficient to pay the legacies in full, the amount thereof entitled to payment was respectively scaled according to the value of the estate which was applicable to such payment. The executor, therefore, whose pecuniary ability *365 has not been questioned in the case, and the securities in his official bond, were liable for the payment of the amount ascertained to be due to the legatee Shover as aforesaid. And there was, if possible, a still firmer and more permanent, or at least a great additional security of the said amount, arising from the fact that the estate of the testator consisted almost exclusively of a debt of upwards of seven thousand dollars, balance *still remaining due of the purchase money of a very valuable tract of land in the county of Augusta, which had been sold by the testator after making his will and shortly before his death, on which land there had been regained, and there still existed, a vendor’s lien for the payment of the purchase money, which rendered such payment, in good money, perfectly secure. Of all these facts the appellant, the guardian of the legatee (Shover, was fully informed and cognizant.
Under these circumstances it was a palpable breach of trust in the said guardian to receive payment of the said sum of $4,SCO in Confederate money on account of said legacy as aforesaid. Such money was, at the time of such payment, very heavily depreciated; that is, depreciated to the extent. in comparison with gold, of eight dollars in Confederate money to one dollar in gold. So that the scaled value of the $4,500, received by the guardian as aforesaid in Confederate money at its nominal amount, was but $562.50 in gold!
Certainly nothing short of the most overruling necessity could have warranted the guardian in making so great a sacrifice as is thus apparent. And certainly no such necessity existed in this case.
Ii is not sufficient to say that many, and, indeed, most of the southern people had strong faith in the ultimate triumph of the Confederate cause, and in the ultimate payment of the Confederate debt; that while Confederate money was never made a legal tender, yet it was receivable in payment of taxes, and its currency was encouraged as much as possible by legislation, and it was considered by many, and perhaps most of the southern people as their patriotic duty, in the management of their own individual transactions, to accredit Confederate money as much as possible, and to receive it without question in payment of debts.
*But what a man. sui juris, may dp in the management of his own individual affairs, and what he may do as guardian of an infant in the management of the affairs of his ward, are two very different things. He may be as partriotic as he pleases in giving away his own, and it will be often meritorious for him to do so. But he cannot be patriotic at the expense of his ward, and cannot give away his ward’s estate or any part of it.
There was certainly no necessity for making such a sacrifice as appears to have been made in this case. The guardian had received of the executor on account of the legacy to his ward, one thousand dollars in good money, or its equivalent, and received it about the time of the commencement of the war. This sum, judiciously applied, would, it seems, have been amply sufficient for the support of the ward during the war. And if more had been required, no doubt it would have been small in amount, and could have been obtained of the executor in further part of the said legacy. It appears that the ward was very inexpensive, and his wants very small. In fact neither the executor nor the guardian expressed, or seem to have felt, any desire to receive Confederate money at par for good money, and each refused at first to do so in regard to the debt due to Moorman to the testator’s estate. They both knew that debt to be perfectly secured, in any event of the war; while they knew that Confederate money and Confederate bonds would only be good in the event of the success of the Confederate cause, if even then; and it is not strange, therefore, that their first impulse was, notwithstanding their hope and belief in regard to the result of the war then flagrant, and to the ultimate payment of Confederate notes and bonds, not to embark the ward’s estate in the, venture of the revolutionary struggle which was then in progress. And it was not until they were informed and advised, as they *seem to have been, that the transaction could be legalized by an investment in Confederate bonds, made by the guardian under the sanction of a judge of a circuit court in vacation, under an act passed March 5, 1863, entitled “an act authorizing fiduciaries to invest funds in their hands in certain cases and for other purposes,” (Acts of Assembly 1862 and 1863, p. 81, eh. 46,) that they consented to the payment of Confederate money in discharge of the legacy due to the ward.
Certainly that act was not designed to authorize, and did not authorize a fiduciary to receive payment of a well-secured good money debt in Confederate money at par when greatly depreciated in value, unless there was some overruling necessity for such a sacrifice, nor a judge to sanction such a proceeding by ordering such Confederate money to be invested as mentioned in the act. On the contrary, its only purpose, as expressly declared in the act, was to make it lawful for a fiduciary having in his hands money received in the due exercise of his trust, which, from any cause whatever, he was unable to pay over to the parties entitled thereto, to apply by motion or petition, to any judge of a circuit court in vacation for leave to invest. &c., in interest bearing bonds or certificates of the Confederate States, &c. That act was certainly not designed to create the very necessity for which it was intended to provide; that is, to authorize the receipt of depreciated Confederate money in payment of a good money debt in order that such Confederate money might be invested in a Confederate bond; but only to authorize such an investment of Confederate money which might be already in the hands of a fiduciary, having been received by him in the due exercise of his *366 trust, and he being unable from any cause to pay it over to the parties entitled thereto.
^Therefore the order obtained from Judge Thompson in this case affords no sanction to the act of'the guardian in receiving the Confederate money and making the investment thereof as was done in this case. The judge had no jurisdiction to make such an order, and would certainly not have made it if the facts of the case had been set out in the petition, or otherwise made known to him. This is a very clear proposition according to several decisions heretofore made by this court. Campbell’s ex’ors v. Campbell’s ex’or, 22 Gratt. 649; Crickard’s ex’or v. Crickard’s legatees, 25 Id. 410; Kirby v. Goodykoontz &c., 26 Id. 298.
It is not a good defence to the guardian in this case that- he did not actually intend to injure the ward by the act complained of, if such injury was’ the necessary or actual result of such act; nor that he derived no profit from the act complained of Jennings v. Jennings, 22 Id. 313; Crickard’s ex’or v. Crickard’s legatees, supra; Moss &c. v. Moorman’s adm’r &c.; 24 Id. 97. In 2 Perry on Trusts, sec. 847, it is said that ‘‘in awarding compensation to the cestui que trust for a breach of trust, the court does not regard it as-material that the trustee has made no profit nor advantage out of the estate. If there is a breach of the trust, and an inevitable calamity destroy the property, the trustee must account for it. If he varies from his duty, he must account for the property at all events.” Citing Clough v. Bond, 3 M. & C. 496.
Much was said in the pleadings and proofs, if not in the arguments in this case, in regard to the facts that John Ii. Crawford is the first cousin of John S.’Moorman; that William Crawford, the executor of George D. Crawford, is second cousin of John H. Crawford and John S. Moorman, and first cousins of Mrs. M. T. Moorman, widow an'd executrix of E. G. Moorman; that John H. Crawford’s father- and Mrs. M. L. Moorman were *brother and sister of George W. Crawford, and would have been two of his heirs-at-law if he had died intestate, and that the ward and appellee, G. T. Shover, was a stranger in blood to the family. But these facts are not sufficient to warrant the inference that there was any conspiracy between these near relations to practice a fraud upon the said ward and legatee, and there was doubtless no such conspiracy. My opinion is based upon the conduct of the parties, in the absence of any such imputation.
Besides the cases cited, supra, the following. which were also cited in the argument, have an important bearing on the subject: Bennett v. Claiborne, &c., 23 Gratt. 366; Ammon’s adm’r v. Wolfe &c., 26 Id. 621; Tosh &c. v. Robertson &c., 27 Id. 270; and Omohundro’s ex’ors v. Omohundro &c., Id. 824.
I am, therefore, of opinion that the said guardian is chargeable as for good money, with the amount received by him in Confederate money of the said William Crawford, executor of the said George W. Crawford, on account of the said legacy to the said G. T. Shover; and that there is no error in holding the said guardian and his official sureties liable for the balance due by said guardian on the basis of his being so chargeable. But it appears by an inspection of the record that such balance on the 25th day of October, 1865, was $5,656.49, according to Commissioner Ranson’s alternate statement No. 2, adopted and confirmed by the circuit court as the basis of its final decree in this case, instead of $5,682.23, the principal sum decreed for in favor of the said George T. Shover, against the said guardian and his sureties, with interest thereon from the said 25th day of October, 1865, till paid, and the costs of said Shover in this suit . in the said court. But that small mistake in the principal of the said balance, being plainly apparent *on the record, can be corrected by this court without reversing the said decree for that purpose. And if there be no other error in the decree, and it be correct and complete in all other respects, it will only be necessary to amend it by correcting the mistake aforesaid and -to affirm it as so amended, with damages and costs.
But a very serious question yet remains for decision, which was discussed by counsel in the argument of this case, both in the court below and this court, and that question is, whether the said E. G. Moor-man’s executors, and the said William Crawford, executor of George W. Crawford, or any or either of them, are also liable on account of the said breach of trust of the said J. H. Crawford.
This question was not put in issue by the original- pleadings in this case, the bill, answer and replication to the answer, and it could not, therefore, have been decided in this case if it had come on to be heard in that state of the pleadings. But the question was put in issue by the amended and supplemental bill and answers thereto and replications to the answers; and the cause came on to be -heard on all the said pleadings. and the decree appealed from was rendered thereon, and must be construed and have the same effect a-s if the matter of the subsequent pleadings had been embraced in the original pleadings in the case. The suit, then, must be considered as a suit not only against J. H. Crawford as guardian of the plaintiff Shover, and the official surties of such guardian, seeking a recovery against them for a breach of trust committed by the guardian, but also against the executors of E. G. Moorman and William Crawford, executor of George W. Crawford, seeking a recovery against them for having aided and participated in the commission of such breach of trust. *If they, or any of them did so, and participated, they, or such of them as did so, are liable accordingly.
In my opinion they did aid and participate in said breach of trust.
*367 In the first place, the executors of E. G. Moorman did so aid and participate. On the 35th day of June, 1863, they paid to the guardian of the plaintiff, on account of his legacy under the will of G. W. Crawford. $4,500 in Confederate States treasury notes at par, said payment being made out ol an ante-war debt due by E. G. Moorman to G. W. Crawford, secured by a lien on real estate of much greater value than the amount of the debt, and with full knowledge that said notes were to be immediately invested by the said guardian, as they actually were on the same day, in a bond of the Confederate States, bearing seven per cent, interest. At the time of such payment said notes were depreciated in value, as compared with gold, in which the said debt was payable, to the extent and in the proportion of eight to one. In other words, the $4,500 thus paid in Confederate notes were worth but $562.50 in gold, and being invested in a Confederate bond as a permanent investment, it thus remained until the end of the war, when it became utterly worthless. But William Crawford and J. H. Crawford refused to receive the said payment in Confederate notes, until at length they were persuaded to do so by E. G. Moorman’s executors, or one of them, J. S. Moorman, who assured them that Judge Thompson would make an order for such an investment. And accordingly on the same day, the whole arrangement was made and executed. Moorman’s executors paid the notes to the guardian, J. H. Crawford, took his receipt therefor to William Crawford, executor of G. W. Crawford, on account of the *legacy,. handed the said receipt to the said executor, who entered a credit for the amount thereof on the bond of E. G. Moorman to G. W. Crawford, a petition was filed by the guardian to Judge Thompson praying for and order for the said investment, which was accordingly thereupon made. By this operation, supposing it to have effect, the estate of E. G. Moorman was benefited to the extent of the difference between $4,500 and $562.50; that is, to the extent of $3,937.50, and the ward was injured to the same extent; in fact was injured to the whole extent of $4,500 in good money! This was a palpable breach of trust on the part of the guardian, in which the executors of E. G. Moorman, or one of them, J. S. Moorman, not only participated, but which he advised and instigated, and actively brought about by his agency, and which enured only to the benefit of E. G. Moorman’s estate.
In the second place, William Crawford, executor of G. W. Crawford, also aided and participated in the said breach of trust. He co-operated in the perpetration of the same, and without such co-operation it could not have been perpetrated. He alone had a right to receive payment of the debt due to his testator’s estate by E. G. Moorman, or any part of it. It was absolutely necessary, therefor, to obtain his consent and co-operation to the arrangement whereby the payment was made in Confederate notes as aforesaid. The act of J. S. Moorman in paying $4,500 in Confederate notes to J. II. Crawford, the guardian, and taking his receipt as for so much money paid to him cn account of the legacy to his ward by William Crawford, executor of G. W. Crawford, was in fact as well as in law, the act of the said executor through the agency of the said J. S. Moorman, and as much implicates and binds the said executor as if he had done it by his own hand. It was done by his *advice and instigation and authority. tie was under peculiar obligations to conserve and take care of the interest of the infant legatee of his testator, who uses in his will this strong language on the subject: “I here wish my friend William Crawford, Sr., to act as executor, and take charge of my estate and my two orphan boys (George T. Shover being one of them) and do the best for them you can, for they will be left in this world without a friend to protect them,, and my prayer is,” &c. He had before said in his will, “1 direct my executor, who will hereinafter be named, to place the said George T. .Shover at some suitable place to be raised, and to pay particular attention to his education and training,” &c. William Crawford was thus constituted testamentary guardian of this orphan and adopted child of his testator, and accordingly acted as such for several years, though he probably never qualified by giving bond and security according to law. At his instance John H. Crawford consented to act as guardian of the said infant, and was appointed and qualified as such. He had it in his power completely to guard and protect the estate of the said infant by refusing to receive t! e well-secured debt out of which his legacy was payable in anything but gold; and certainly not in Confederate treasury notes, so greatly depreciated in value as they then were. And that was certainly his duty. But he did not do it. He was guilty of a breach of trust in that respect. And he advised and instigated and aided in the breach of trust committed by the guardian, which could not in fact have been committed without his co-operation.
These parties, J. S. Moorman and William Crawford, thus participated in the breach of trust committed by J. H. Crawford, guardian of G. T. Shover, and are liable therefor on principles which have been well settled by this court in several cases. See Cocke &c. v. Minor &c., *25 Gratt. 246; Jones’ ex’ors v. Clark &c., Id. 642; and the cases cited in those two cases. See also Tosh &c. v. Ropertson &c., 27 Id. 270.
I am therefore of opinion that the said J. H. Crawford, J. S. Moorman and William Crawford are jointly and severally liable in this case, and that the decree ought to be against them all and the sureties of the said guardian, instead of against the said guardian and his sureties only. But as my brethren differ with me in regard to the liability of the said J. S. Moorman and William Crawford, and concur with me only in my opinion in regard to the liability of the said guardian and his sureties, it follows, *368 therefore, that the decree appealed from must be amended as aforesaid and affirmed.
Christian, J.
If the suit in this case had been brought for the purpose of fixing liability upon the executor of Moorman and the executor of Crawford, as well as upon the guardian and his sureties, and if it had been charged in the bill that the guardian and his sureties were insolvent and that he had committed a breach of trust, in which the executor of Moorman and the executor of Crawford had participated, upon such a bill, sustained by the proofs, a very different question would be presented, involving very different considerations.' Tltat' is not the case before us, and need not be decided here; But in this case the ward has recovered his decree against his former guardian and his sureties. He is satisfied with that decree and does not appeal from it. The question is, therefore, whether the guardian (not the ward) upon the pleadings and proofs in the cause, can be heard to complain now, for the first time in the appellate court, that the decree of the circuit court is erroneous because he, having committed a breach of trust, ought not alone be held responsible therefor,, but that *others who • participated with him in such breach of trust ought to be held equally liable with him. This is a position which the ward plight properly take, but which the guardian, certainly in the pleadings in this cause and in the face of his sworn answers, ought not to be permitted to assume. So far as Moorman’s executor is concerned it is sufficient to say, that, it being his duty to pay the debts of his testator, he had the right to pay in a depreciated currency if there was the hand of a party, sui juris, who was willing to receive it, and a discharge by such an one was a full and complete discharge and satisfaction of the debt. The debt was due to Crawford's executor; he agreed to receive it if Moorman would bring to him a receipt from the guardian, to whom the money, was to be paid over bj' Crawford’s executor. Upon the production of this receipt Crawford’s executor credited Moor-man’s bond by that amount. In the absence of all proof of fraud, or participation in -any breach of trust, this was a valid payment of Moorman’s debt which could never after-wards be questioned.
Now, as to Crawford’s executor, the record abundantly shows that he acted with the utmost prudence and good faith. When the proposition was made to him to receive the Moorman debt, well secured upon teal estate, ■ he (after taking the advice of an able and distinguished lawyer, the lamented Baldwin,) peremptorily refused to receive jt; but said in substance to Moorman,.that if the guardian was willing to receive it and would take all the responsibility of receiving a gold debt so well secured, in a depreciated currency, he would accept the guardian’s • receipt and credit it on Moorman’s bond. The guardian, both in his answer to the original and amended bills, affirms positively that he received on his own responsibility and on his own judgment the Confederate money from Moorman, and defends himself in the court *below in all the pleadings and evidence which he has taken, upon the ground that it was the best arrangement he could make for his ward; that what he did in the premises was done in good faith, from which he received no profit or advantage, and that, therefore, he ought not to be held responsible for a collection and investment which he thought at the time was for the advantage of his ward, and which he could not then foresee would be worthless. He nowhere affirms, .or even intimates, that he was induced or instigated to the course he pursued by Crawford’s executor or Moor-man’s executor, but on the contrary, emphatically affirms in the last paper filed in the cause (his answer to the amended bill), that he acted upon his own authority and his own judgment, and seeks to justify his action in this respect as one made in good faith and for the best interest of his ward.
After this, he cannot now, for the first time in the appellate court, shift upon the shoulders of others the burthen which he deliberately took upon himself. It is clear that but for the conduct of the guardian in this case, the investment for the ward, as left by the testator, would have remained intact. The loss was occasioned not by Crawford’s executor, but by the act of the guardian, and he and his sureties alone are responsible. The pleadings and evidence in the cause do not, in my opinion, justify this court in saying, what the appellate has never pretended or said, that in collecting Confederate money for a gold debt well secured, and investing the same in Confederate bonds, he was instigated, aided, and advised by Crawford’s executor and Moor-man’s executor.
I am for fixing the liability in this case where it has been fixed by the parties as well as by the law, and am for affirming the decree of the circuit court without any change or modification whatever.
*Staples and Burks, J’s, concurred m the opinion of Moncure, P., except as to the liability of William Crawford and Moorman’s executors. On that point they concurred with Judge Christian.
Decree amended and affirmed.